**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

| | |
|---|---|
| **STEPHANIE MUSE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )      **Civil Action No. WGC-10-1105** |
| | ) |
| **SUPERVALU INC.** | ) |
| | ) |
| **Defendant.** | ) |

_____

## MEMORANDUM OPINION

Plaintiff Stephanie Muse ("Mrs. Muse") brought this action against Defendant Supervalu Inc. ("Supervalu"), a parent corporation with many subsidiaries including Shoppers Food Warehouse Corporation ("Shoppers Food Warehouse") (a fourth tier subsidiary[1]), alleging negligence and seeking damages in the amount of one million dollars, twenty cents ($1,000,000.20). The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 15. The case thereafter was referred to the undersigned. *See* Document No. 16. Pending before the Court and ready for resolution is Supervalu's Motion for Summary Judgment (Document No. 24). Mrs. Muse filed an Opposition (Document No. 33), Supervalu filed a Response to Mrs. Muse's Opposition (Document No. 35), Supervalu filed a Supplement to its Motion for Summary Judgment, or Alternatively, Motion *in Limine* to Exclude Plaintiff's Expert Edward J. Primeau (Document No. 37), and Mrs. Muse filed a Supplemental Memorandum in Opposition to

---

[1] *See* Document No. 8, Ex. 1 at 2 (Supervalu Inc. and Subsidiaries – Organizational Structure).

Supervalu's Motion for Summary Judgment, and Motion *in Limine* to Exclude Mrs. Muse's Expert Witness Edward J. Primeau (Document No. 38).

Both parties requested an oral hearing. *See* Document Nos. 24, 33. No hearing is deemed necessary and therefore both requests for oral hearing are **DENIED**. The Court now rules pursuant to Local Rule 105.6 (D. Md. 2010).

## BACKGROUND[2]

On May 26, 2007 Mrs. Muse visited the Shoppers Food Warehouse located at 19284 Circle Gate Drive, Germantown, Maryland. Mrs. Muse was shopping alone. She patronizes this store approximately every other week. About 25 minutes after arriving at the store, between 1:00 – 1:15 p.m.[3], Mrs. Muse, pushing a shopping cart, walked toward the back of the store, in the dairy aisle. She described what happened.

> A: And I got around to where the dairy aisle is, the cheese and eggs area which is in the very back of the store and I got near the cheese section and it was just a split second occurrence where I saw the cart going one way and I could just feel my ankle just twisting like a ballerina and I just fell.

Mem. Law & Fact Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex. A (Muse Dep. 18:22 – 19:6).

Other shoppers gathered around Mrs. Muse. The store manager was notified of the incident and arrived at the scene. The store manager asked Mrs. Muse what had happened and she described what occurred. Meanwhile the store manager instructed an employee to put cones around the area. The store manager further instructed an employee to bring a chair.

---

[2] In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

[3] In her Complaint Mrs. Muse stated the incident occurred between 2:30 – 2:45 p.m. Compl. ¶ 5.

This employee attempted to assist Mrs. Muse to the chair but Mrs. Muse could not stand. The employee therefore gave Mrs. Muse a roll of paper towels to rest her head.

While Mrs. Muse was on the floor, she watched the store manager "remove something from the floor with his hand and another employee attempting to wipe something up with a cloth[] and the manager signaled him to stop. The paramedics finally arrived and moments later my daughter arrived. The black male paramedic pointed out to the manager and another paramedic that there was some kind of mashed fruit and liquid on the bottom of my shoe." Mem. Law & Fact Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 1 (Stephanie Muse Aff.).

One of the store employees had called 911. Mrs. Muse was asked whom the store should contact on her behalf. Mrs. Muse identified her daughter and provided a telephone number. In response to this call, Jessamyn Muse arrived at the Shoppers Food Warehouse. Jessamyn Muse arrived at the store before the paramedics lifted Mrs. Muse from the floor. Jessamyn Muse recalled a comment by one of the paramedics.

> The black male paramedic that was on the scene examined [Mrs. Muse's] foot before they lifted her on the stretcher. As he took a look at the bottom of her shoe, he said, "Look, it looks like some kind of mashed fruit she slipped on." I took a look at it, as did the other male paramedic on the scene. The skin of the fruit and the juice were on the bottom of her shoe.

*Id.*, Ex. 3 (Jessamyn Muse Aff.).

Mrs. Muse was taken to the Shady Grove Emergency Center. Her daughter, Jessamyn Muse, and her husband, Jesse Muse, reported to the emergency center. According to Mrs. Muse and her husband, the staff at the emergency center instructed Mr. Muse to go to Shoppers Food Warehouse and obtain a statement about how Mrs. Muse fell. *Id.*, Ex. 1 (Stephanie Muse Aff.) ("The staff at the emergency center instructed him to return to the store

and get a statement."); Ex. 2 (Jesse Muse Aff.) ("The staff at the Shady Grove Emergency Center talked to me and suggested I go back to SFW to obtain a written statement as to what had occurred."). Jessamyn Muse however does not attribute her father's visit to the grocery store at the behest of the emergency center's staff. "While [Mrs. Muse] was at the Shady Grove Emergency Center in Germantown, MD getting examined by the doctor, my father and I went back to Shoppers to go speak with them about what happened earlier." *Id.*, Ex. 3 (Jessamyn Muse Aff.).

Upon arriving at Shoppers Food Warehouse, Mr. Muse asked to speak with the store manager, who met Mr. Muse and Jessamyn Muse. Mr. Muse asked what had happened resulting in his wife's injury.

> The store manager informed us that he had reviewed the tape of the [sic] when my wife had fallen and he said that my wife had slipped on some grapes. So I asked the manager if he would show me the camera of the fall and he said he could not show me the tape. Then, I asked him if he could give me a written statement as to what had happened. That is when he wrote me [a] note and signed it and said if we needed anything to let him know.

*Id.*, Ex. 2 (Jesse Muse Aff.).

Jessamyn Muse corroborates Mr. Muse's recollection.

> A male manager met with my father and I. He said, "I looked at the tapes and looks like she slipped on some grapes on the floor." My father asked to see the tape and the manager told him that he couldn't allow it. So my father asked him, "Well, if you can't let me see the tape, I need some proof of what you just told us. Can you write it out or something?" The manager wrote out a note and signed it with the date. When he handed it over to my father, he said again, "Please, if there is anything we can do, let me know." My father and I took the note and went to Shady Grove in Rockville, MD where my mother was transferred.

*Id.*, Ex. 3 (Jessamyn Muse Aff.).

This handwritten note states the following:

> 5/26/07
>
> At 2:30 – 2:45 pm Stephanie Muse was in Shoppers and fell while shopping in the back [a]isle of the store.
>
> JWarfield.

*Id.*, Ex. 5.

The doctors at the emergency center had determined that Mrs. Muse's left ankle was broken. She was transferred to Shady Grove Hospital in Rockville. She had surgery the following day.

Upon her release from the hospital a few days later, Mrs. Muse received a telephone call from the manager at Shoppers Food Warehouse. "He informed me that he had watched the store video of the incident and that a guy that was in the [a]isle before I had arrived dropped his grapes." *Id.*, Ex. 1 (Stephanie Muse Aff.).

## JURISDICTION AND VENUE

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Mrs. Muse resides in Germantown, Maryland. *See* Compl. Supervalu is incorporated in the State of Delaware and its principal place of business is Minneapolis, Minnesota. Document No. 1 ¶ 6. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. *Id.* ¶ 7.

Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Court notes Supervalu removed this case from state court to federal court. *See* Document No. 1.

**<u>STANDARD OF REVIEW</u>**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984)

(quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

A.    *Supervalu's Motion in Limine to Exclude Plaintiff's Expert Witness Edward J. Primeau*

Before addressing the substantive issues of the summary judgment motion, the Court first turns its attention to Supervalu's motion to exclude Plaintiff's Expert Witness, Edward J. Primeau. Supervalu contends Mr. Primeau's opinions, as reflected in his report, are not reliable or relevant. Even if the Mr. Primeau's opinions are found relevant, Mr. Primeau's opinions should be excluded pursuant to Federal Rule of Evidence 403. Not surprisingly, in opposition, Mrs. Muse asserts Mr. Primeau's opinions are not only reliable but also relevant.

Mr. Primeau identifies himself as a Video Forensic Expert. He was retained by Mrs. Muse on or about December 10, 2011. *See* Document No. 37, Ex. B (Primeau Dep. 11:18 – 12:1). Mr. Primeau was retained "[t]o review some surveillance footage from a store and render an opinion about the footage." *Id.*, Ex. B (Primeau Dep. 12:7 – 8).

On January 3, 2011 Mr. Primeau addressed a two and one-quarter page letter to Mrs. Muse's counsel documenting his findings after reviewing the surveillance footage. Excluding the first and last paragraphs of that letter, Mr. Primeau wrote,

> The video on this CD Rom represents video removed from a digital CCTV video system at Supervalu. It is video coverage in the Supervalu store taken from one camera and does not completely show the entire incident. This was not an appropriate export

from the CCTV system and intentionally exported to avoid the facts as the[y] occurred which is the true purpose of a closed circuit television system. All cameras on the CCTV system should have been provided to all interested parties at the time of the incident instead of an export from just one camera which does not include the incident.

In other words, this store is equipped with a closed circuit television system that has at least 8 cameras. I know this because the video we have been provided on this above mentioned CD Rom I have reviewed indicates in the date and time stamp that it is of Ch 8. Based on my 25+ years experience as a video forensic expert, a store this size should have 12 to 20 cameras for proper coverage.

I find this camera angle particularly unusual and not useful because it covers a very small area in the store, approximately 20 square feet. For theft protection, several other cameras are necessary to cover retail space on all aisles especially the aisle where the incident occurred. All interested parties should have been provided with all the cameras digital video footage instead of just one that is unusable and does not show the incident as it occurred.

I understand that the original footage has been deleted or recycled from the CCTV system at Supervalu and is no longer available for forensic examination. Based on my 25+ years as a video forensic expert . . . , it is my opinion that all digital closed circuit television systems store digital video footage once it has been FLAGGED as an event and/or EXPORTED, saved or copied to an external media like a CD, hard drive or thumb drive. The original footage is crucial to preserve the multiple camera view[s] of the incident in case of necessary forensic examination. After the footage has been flagged, the system stores the information indefinitely until it is manually deleted.

I have two concerns with the state of the video footage in its current form.

> 1. The video that has been provided does not include appropriate store coverage. I cannot see the entire incident as it occurred. All cameras on the CCTV system should have been preserved and provided to all interested parties. I understand that in a deposition of the plaintiff,

she stated that the store manager informed her that he had watched the video footage of the incident and observed grapes being spilled by another customer before the incident. The footage provided to me is not the complete footage from the Supervalu CCTV system because it does not show grapes being spilled on the video provided.

2. I believe that the original digital video footage has been intentionally deleted. Based on my 25+ years experience as a video forensic expert, once an incident occurs and a digital video file has been exported, the files will not recycled [sic]. They must be manually deleted. The limited view camera video that has been provided by Supervalu supports my conclusion that either Supervalu deleted the appropriate video which was viewed by the manager or refuses to provide all footage relevant to the incident as it occurred. The additional isolated cameras that should have covered the entire incident would provide additional information for the court. If the original video recording of the incident was still in the CCTV system as it should be[,] all interested parties could view all cameras in the store at the time of the incident and see the events as they actually occurred.

I conclude that Supervalu had the knowledge and ability to present all interested parties with the appropriate multiple camera export from the CCTV system and withheld necessary footage and information that is relevant to this case. Instead, a single camera view was provided to keep the incident as it occurred from being reviewed at a later time.

I also conclude, based on my experience and training, that the original footage was intentionally deleted from the Supervalu CCTV system to keep anyone from viewing all in store cameras. CCTV systems are designed to store footage once an incident has occurred and removed from the recycle cue.

It is my conclusion, as previously stated that Supervalu did not provide all necessary footage especially the footage that was viewed by the manager that showed the entire incident as it occurred. Based on my experience, when parties delete video or refuse to provide all video, the party withholding CCTV video footage exhibits their liability.

Pl.'s Opp'n, Ex. 7 (Letter from Primeau to Ubom, Esq. of 1/3/11 at 1-3); Document No. 37, Ex. A (Letter from Primeau to Ubom, Esq. of 1/3/11 at 1-3); Document No. 38, Ex. 10 (Letter from Primeau to Ubom, Esq. of 1/3/11 at 1-3).

Supervalu's counsel subsequently deposed Mr. Primeau by telephone on April 4, 2011.

Counsel asked various questions to learn about Mr. Primeau's investigation and methodology.

Q:      Have you reviewed any pleadings?

A:      No.

Q:      Any deposition testimony?

A:      No.

Q:      Any discovery?

A:      Nope.

Q:      Any incident reports?

A:      No.

Q:      You said you've never visited the store?

A:      No.

*                              *                              *

Q:      Have you ever been to any Supervalu store?

A:      I may have.

*                              *                              *

Q:      Have you ever heard of a store called Shoppers Food Warehouse?

A:      No.

Q:      How big was this particular store?

A:     I have no idea.

Q:     How many employees?

A:     I have no idea.

Q:     How many customers average a day?

A:      I have no idea.

\*                              \*                              \*

Q:     When was the surveillance system put into effect at the store, put in place?

A:     I have no idea.

Q:     Do you know the name or make or model of the surveillance system?

A:     No, I don't; but I do know a little bit about the files that were on the disk.

Q:     We'll get to that in a second.

       How many cameras were in the store?

A:      At least eight.

Q:     And how do you know that?

A:     Because the file number of the camera that I had the privilege to review was labeled number 8.

Q:     Where were – – if there was at least eight, where were the other seven located?

A:     I don't know.  I asked for a camera grid during one of the calls, and I was told that that wasn't available.

Q:     What was the purpose of the surveillance system for the store?

A:     Security, theft.

Q:     How do you know that?

A:     Because that's what closed circuit television systems do when they're in place in retail establishments.

*                              *                              *

Q:     But you don't know with this particular store; is that correct?

A:     Every retail system that I've ever examined has been in place for security purposes.

Q:     Okay.  So you agree with me you don't know for this particular store; is that correct?

A:     Why the system's in place?

Q:     Yes.

A:     It's in place for security.  I do know why it's in place.

Q:     Okay.  Have you interviewed anybody from the store?

A:     No.

Q:     Anybody from the company?

A:     No.

Q:     Anybody from the corporation?

A:     No.

Document No. 37, Ex. B (Primeau Dep. 17:3 – 12, 19 – 20, 18:3 – 11, 19:17 – 20:19, 21:1 – 17).

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining whether expert opinion testimony is reliable and relevant, this Court must apply a two prong test.

The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citations omitted).

The Advisory Committee Note to Rule 702 lists additional factors which courts have considered in determining whether expert opinion testimony is sufficiently reliable including the following three factors:

(1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. . . ."

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . . [and]

(3) Whether the expert has adequately accounted for obvious alternative explanations.

Fed. R. Evid. 702 advisory committee's note (internal citations omitted).

The Court will now evaluate Mr. Primeau's opinions in light of the above standards.

The Court finds as *unreliable* Mr. Primeau's opinions about the closed circuit television system at the Shoppers Food Warehouse where Mrs. Muse fell. First, Mr. Primeau did not visit the grocery store where the incident occurred. Nonetheless, Mr. Primeau opined how many

cameras were in the store at the time of the incident ("Based on my 25+ years experience as a video forensic expert, a store this size should have 12 to 20 cameras for proper coverage"). During the deposition Defendant's counsel inquired about this opinion ("Q: Where were – – if there was at least eight, where were the other seven [cameras] located?  A:  I don't know.  I asked for a camera grid during one of the calls, and I was told that that wasn't available."). Since Mr. Primeau did not visit the store and did not speak with any employees or managers at the store, Mr. Primeau did not know the size of the store ("Q:  How big was this particular store?  A:  I have no idea.").

Mr. Primeau opined that Shoppers Food Warehouse intentionally deleted portions of the original footage and further opined that Shoppers Food Warehouse failed to provide all necessary footage.  Mr. Primeau, for reasons unknown to the Court, did not visit the store.  But during the deposition Mr. Primeau acknowledged the importance of visiting a store as part of his forensic examination.

> Q:     Now, you mentioned that you have requested the original of this video; is that correct?
>
> A:     Yes.
>
> Q:     Now, when a video is flagged or exported – – in the previous cases that you've done, when a video is flagged or exported, do you normally receive the originals of those videos?
>
> A:     Well, you don't – – you don't receive them, you actually examine them.  So that if something is necessary to see within those originals, I have an opportunity to examine them.
>
> Q:     Okay.  My question was, so the other stores that you reviewed videos – –
>
> A:     Yes.

Q:	– – do you normally receive the original to examine?

A:	I don't receive them, **I go to the store to review them**.

Q:	Okay.  And how does that help?  How does the original help as compared to a copy?

A:	Well, there's several things.  First of all, you can go in as an expert and you can review as many different cameras, because they're all recorded separately and individually, and you can go in and you can select which camera you'd like to review.  You have the opportunity to look at the grid of where the camera placement is within the store.

You also have an opportunity – – and this is a very important step – – **to examine the administrator log and determine who has been in and out of the system, who deleted the footage who exported the footage that I was able to look at, and any other type of administrator–only function that that system that has**.

Document No. 37, Ex. B (Primeau Dep. 43:16 – 45:5) (emphasis added).

Mr. Primeau, in essence, admits he did not follow his normal investigative procedure or methodology before rendering his opinions.  Thus Mr. Primeau's opinions, including that Supervalu "withheld necessary footage and information" and "intentionally deleted" the original footage and "did not provide all necessary footage," are *unreliable*.

Second, the Court finds Mr. Primeau presumed certain "facts" based on the brief footage he watched.  He did not verify those "facts" by visiting the store, examining the closed circuit television system at the grocery store, or interviewing the manager and employees.  The lack of a foundation for Mr. Primeau's opinions is exemplified in the following colloquy.

Q:	Now, you said in your report on page 1 – – now I'm going down to the third paragraph – – that "Based on my 25 years of experience as a video forensic expert, a store this size should have 12 to 20 cameras for proper coverage."

A:      That's correct.

Q:      But you don't know the size of the store.  So what's the basis for that?

A:      Every system I've ever examined in any kind of retail establishment, Wal-Mart, Target, any other stores that I've – – I've looked at parking lot footage and on and on and on have had several cameras in there.

          If this is the standard size grocery store with checkouts and pharmacy and all the things you just mentioned, there's got to be at least 12 cameras in that store.

Q:      But you're saying based on the size of this store when you don't know the size of the store, correct?

A:      It's a grocery store.  You just got done telling me there were checkouts and pharmacies and all these other areas – –

Q:      I didn't tell you anything.  I asked you, was there cameras over the checkout.  I asked you, was there cameras in the pharmacy.  I'm not telling you any facts.  I'm asking you questions.

A:      Yes, I think there were 12 cameras in this store, even though I don't know the size of the store.

*Id.*, Ex. B (Primeau Dep. 29:5 – 30:11).

Third, Mr. Primeau opined regarding Shoppers Food Warehouse's failure to preserve

certain footage but could not identify any requirement to save such images.

Q:      "Based on my 25 years as a video forensic expert," then you say, "it's my opinion that all digital closed circuit television systems store digital video footage once it's been flagged as an event and/or exported, saved, or copied to an external media like a CD.

A:      Okay.

Q:      And then – – in this case, that happened, correct?

A:      Yes, sir.

Q:      Then it says, "The original footage is crucial to preserve the multiple camera views of the incident in case of necessary forensic examination."

Once it's saved to a CD, what do you mean the original footage?

A:      The original footage is the footage that's in the hard drive.

Q:      Okay.  So you're saying that should have been saved on the hard drive?

A:      Any time any activity is done and it's a digital system, like exporting files or reviewing them when an incident has occurred, it is an automatic function to take that footage for that date and the time coordinate out of the erase queue.  The erase queue is what recycles the recording on a hard drive.

So if we go for a period of time and nothing happens, the oldest footage will automatically be deleted with the newest footage, and it just keeps recycling.  But once that footage is touched, exported or anything is done to it, it's put into what I'm going to call an alarm file, which means it takes it out of the queue for automatic erasure.

Q:      Okay.  So you're saying it should have been taken out of the queue.  And I'm going to go back to my question[4] a couple moments ago.

Are you aware of any federal, state, county, local law, code, or ordinance that requires a grocery store to do that?

A:      No.  But it should – – it's in their best interest to preserve as much as they possibly can about an incident where somebody's fallen and hurt in their store.

*Id.*, Ex. B (Primeau Dep. 33:5 – 35:2).

---

[4] Q:   Are you aware of any federal, state, county, or local law or local ordinance code which requires the retail store to preserve more video footage than what was preserved in this case when a slip-and-fall accident occurred?
  A:  No.
  Q:  And you are not aware of any written industry standard concerning the same of grocery stores, are you?
  A:  No.
Document No. 37, Ex. B (Primeau Dep. 32:6 – 15).

For the reasons outlined above, Mr. Primeau's opinions fail the first prong of the *Westberry* test, *i.e.,* Mr. Primeau's opinions are not reliable because they are not supported by adequate validation to render them trustworthy. Moreover, under Federal Rule of Evidence 702, Mr. Primeau's proffered expert opinion testimony (1) is not based on sufficient facts or data and (2) is not the product of reliable principles and methods.

Although the Court has explained why Mr. Primeau's proffered expert opinion testimony is not reliable and thus must be excluded, the Court will nonetheless consider the second prong of the *Westberry* test.

Expert testimony must not only be reliable but also must be relevant to the facts at issue. The relevant fact in this slip and fall litigation is not whether Shoppers Food Warehouse preserved the complete sequence of events surrounding Mrs. Muse's fall or whether Shoppers Food Warehouse intentionally deleted portions of the recording. The relevant fact in this slip and fall litigation is whether Shoppers Food Warehouse had **actual notice** or **constructive notice** of the substance on the floor in sufficient time to remedy the hazard. Mr. Primeau's proffered opinions fail to address this relevant fact.

> Q:      What caused M[r]s. Muse to fall?
>
> A:      I've heard by talking to Mr. Ubom – – I don't know this personally, I did not experience it, but I heard it was grapes or grease.
>
> Q:      Grapes or grease?
>
> A:      Yes.
>
> Q:      Okay. And you don't know how it got on the floor?
>
> A:      No.

> Q:     And you don't know how long it was on the floor before she fell?
>
> A:     No.
>
> Q:     And you have no opinion as to whether – – how – – how long it lasted, time on the floor evidence before she fell?
>
> A:     No.  That's not my expertise.

*Id.*, Ex. B (Primeau Dep. 31:12 – 32:5).  Based on the relevant fact at issue in this litigation, Mr. Primeau's proffered expert opinions are not relevant.  Because Mr. Primeau's proffered expert opinions do not satisfy the second prong of the *Westberry* test, Mrs. Muse is precluded from offering Mr. Primeau's opinions.

Alternatively, it is apparent to the Court that Mrs. Muse is asserting an allegation of spoliation of evidence against Shoppers Food Warehouse.  Under Maryland law, "[t]he destruction or alteration of evidence by a party gives rise to inferences or presumptions unfavorable to the spoliator, the nature of the inference being dependent upon the intent or motivation of the party.  Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable to his cause, but would not in itself amount to substantive proof of a fact essential to his opponent's cause."  *Miller v. Montgomery County*, 64 Md. App. 202, 214, 494 A.2d 761, 768 (1985).  In this case Mrs. Muse is suggesting, through Mr. Primeau's proffered opinions, that Shoppers Food Warehouse intentionally deleted portions of the footage showing an unidentified male customer dropping grapes on the floor which Mrs. Muse subsequently slipped on and fell.  Mrs. Muse is apparently also suggesting that the grapes where on the floor long enough that Shoppers Food Warehouse had at least constructive notice (if not actual notice), that the footage (which would include the

time) would prove that Shoppers Food Warehouse had such notice and thus to avoid liability Shoppers Food Warehouse had that portion of the recording deleted.

Even if Mrs. Muse's assertion of spoliation of evidence was proved (and the Court notes that Mr. Primeau's proffered opinions are not based on physically reviewing and examining the closed circuit television system at Shoppers Food Warehouse), that fact, in and of itself, would not prove an essential fact in Mrs. Muse's case, *i.e.,* time on the floor evidence.  In *Goin v. Shoppers Food Warehouse*, 166 Md. App. 611, 890 A.2d 894 (2006), the Court of Special Appeals of Maryland declined to reverse a lower court's entry of summary judgment for Shoppers Food Warehouse in a slip and fall case where Ms. Goin accused Shoppers Food Warehouse of spoliating evidence.  "From our review of the record in the case at bar . . . we are persuaded that the evidence is legally insufficient to generate a genuine dispute of fact on the issue of whether appellee's 'destruction' of whatever perishable item was removed from the floor during 'clean up' (that appellee was required to conduct) constituted 'fraudulent conduct aimed at suppressing or spoliating evidence.'"  *Id.* at 616, 890 A.2d at 897 (citation omitted).

Finally, even if this Court had found Mr. Primeau's proffered expert opinions reliable and relevant and thus admissible under Federal Rule of Evidence 702, this Court would nonetheless exclude Mr. Primeau's proffered opinions under Federal Rule of Evidence 403.

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If Mr. Primeau testified at a jury trial consistent with his proffered opinions, the Court finds a jury would be easily confused about the issues, since Mr. Primeau's testimony would

have jurors fixated on whether Shoppers Food Warehouse intentionally deleted portions of the video showing Mrs. Muse's accident and jurors would likely begin to speculate whether the "deleted portions" showed not only who dropped those grapes but how long those grapes were on the floor before Mrs. Muse's arrival on the scene. Additionally, the relevancy of Mr. Primeau's proffered opinions is outweighed by unfair prejudice. Mr. Primeau accuses Shoppers Food Warehouse of deliberately and intentionally deleting portions of the footage and boldly declared, "[b]ased on my experience, when parties delete video or refuse to provide all video, the party withholding CCTV video footage exhibits their liability." Pl.'s Opp'n, Ex. 7 (Letter from Primeau to Ubom, Esq. of 1/3/11 at 2-3). Furthermore, in noting the absence of video from multiple cameras showing Mrs. Muse's slip and fall, Mr. Primeau proclaimed, "a single camera view was provided to keep the incident as it occurred from being reviewed at a later time." *Id.*, Ex. 7 at 2.

For the above reasons, Defendant's motion in limine to exclude Plaintiff's Expert Edward J. Primeau will be granted. The Court now turns its attention to the relevant fact at issue in this case.

B.      *Overview – Premises Liability*

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address some preliminary matters. Since this Court's jurisdiction is based on diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions. Under Maryland law a property owner owes a certain duty to an individual who comes in contact with the property, and the scope of the duty owed is dependent upon the individual's status while on

the property.  *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998).  Maryland law recognizes four categories of individuals:  (1) an invitee, (2) a licensee by invitation, (3) a bare licensee and (4) a trespasser.  An invitee is an individual who is on the property for a purpose related to the landowner's business.  "An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own safety, will not discover."  *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333, 1343 (1986).

A licensee by invitation is a social guest and the landowner "owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable."  *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted).  For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully or wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning the [bare] licensee.'"  *Id.* (citation omitted).  For a trespasser, someone who intentionally and without permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

On May 26, 2007 Mrs. Muse was a customer at the Shoppers Food Warehouse in Germantown, Maryland.  She was in the store to purchase groceries.  Mrs. Muse was in the store for a purpose related to Shoppers Food Warehouse's business.  Mrs. Muse was thus an invitee.

C.      Negligence

Under Maryland law negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do.  *Maryland Civil Pattern Jury Instruction* 19:1.  Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances."  *Id.*  To establish a *prima facie* case of negligence, Mrs. Muse must prove "'(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'"  *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (quoting *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995), citing *Rosenblatt v. Exxon*, 335 Md. 58, 76, 642 A.2d 180, 188 (1994)).

Shoppers Food Warehouse owes a duty of ordinary care to keep its premises safe for an invitee such as Mrs. Muse.  That duty is defined as follows:

> [A]n owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care.  The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.

*Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374 (1997) (internal citations omitted).

Shoppers Food Warehouse is not an insurer of Mrs. Muse's safety while Mrs. Muse is on its premises.  "[N]o presumption of negligence on the part of the owner arises merely from a

showing that an injury was sustained in his store." *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965). Therefore, "[i]n an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition or had actual or constructive knowledge of its existence." *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 119, 113 A.2d 405, 408 (1955).

The parties do not dispute that Shoppers Food Warehouse owed a duty of ordinary care to keep its store in a reasonably safe condition for Mrs. Muse, an invitee. Mrs. Muse contends Shoppers Food Warehouse breached that duty because Shoppers Food Warehouse had *actual or constructive knowledge* of the grapes on the floor. "The actions of Mr. Warfield, removing the grapes from the floor where M[r]s. Muse fell, and his further actions of ordering another employee not to wipe the liquid on the floor, and his further action of refusing to show or give the video, showing the person who purportedly dropped the grapes to Mr. Muse, proves that the grapes were on the floor for a reasonable amount of time for Shoppers to know or to have known of the danger." Pl.'s Opp'n at 7.

Mrs. Muse testified that she did not see the grapes on the floor before slipping and falling.

> Q:      Do you know what caused you to slip?
>
> A:      Not at the time that I fell, no.
>
> Q:      Did you determine later what caused you to slip?
>
> A:      Yes.
>
> Q:      What was it?

> A:      Grapes or some kind of fruit that was on the floor.
>
> Q:      Did you see the grape or fruit on the floor before you stepped in it?
>
> A:      No.
>
> Q:      Do you know how it got on the floor?
>
> A:      According to the store manager who called me later he said there were grapes that had been spilled.
>
> Q:      Do you have any personal knowledge as to how it got on the floor?
>
> A:      Just according to what the manager said.
>
> Q:      Personal knowledge?
>
> A:      I'm sorry.  Repeat that.
>
> Q:      Personal knowledge is what you observed.
>
> A:      No.
>
> Q:      Do you know how long the fruit was on the floor before you stepped on it.
>
> A:      No.

Def.'s Mem., Ex. A (Muse Dep. 20:2 – 21:3).

According to Shoppers Food Warehouse, Mrs. Muse fails to produce any facts about "time on the floor" evidence and thus Mrs. Muse cannot prove Shoppers Food Warehouse's negligence.  In *Maans v. Giant of Maryland, LLC*, 161 Md. App. 620, 639-40, 871 A.2d 627, 638 (2005), the Court of Special Appeals of Maryland explained the purposes of "time on the floor" evidence.

> (1) [I]t requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can

decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the floor. Thus, proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

Mrs. Muse asserts she can establish "time on the floor" evidence.

> Even though the Manager did not inform M[r.]/[Jessamyn] Muse when the grapes were dropped or by whom, or how long it was on the floor before [Mrs. Muse] slipped and fell, the uncontroverted evidence is that the Manager watched the video and confirmed that Shoppers was aware of the dangerous condition, and did not war[n] [Mrs.] Muse.

Pl.'s Opp'n at 7.

> [Mrs.] Muse can prove that Shoppers had actual or constructive knowledge of the dangerous condition and that the knowledge was gained in sufficient time to give them the opportunity to remove it or warn invitees because she was in the Store for about 25 minutes before she slipped and fell.

*Id.* at 8.

Shoppers Food Warehouse rejects Mrs. Muse's contention that "time on the floor" evidence can be established based on the length of time Mrs. Muse was in the store before slipping and falling.

> Although Plaintiff repeatedly asserts that she shopped for twenty-five (25) minutes before she fell, she never explains how this fact somehow correlates to producing "time on the floor evidence." Without any explanation for her logic, she simply seems to assert that the time she spent in the store shopping, should be taken into account for when or how the store owner should have had actual or constructive knowledge.

Document No. 35 at 1-2.

The Court finds there is *no* correlation between the length of time Mrs. Muse shopped in the store and when the unidentified male customer dropped some grapes. The grapes may have fallen on the ground 1 minute before Mrs. Muse's arrival, 5 minutes before Mrs. Muse's arrival, 10 minutes before Mrs. Muse's arrival or 15 minutes before Mrs. Muse's arrival. The hurdle facing Mrs. Muse is the lack of evidence about the length of time the grapes were on the floor.

In this case Mrs. Muse has not presented any evidence from which it could be reasonably inferred that Shoppers Food Warehouse created the dangerous condition. In fact, Mrs. Muse asserts another customer created the dangerous condition (the unidentified male customer who dropped the grapes). There is no evidence that Shoppers Food Warehouse had actual knowledge of the dangerous condition. Mrs. Muse thus must establish that Shoppers Food Warehouse had constructive knowledge.

Mrs. Muse claims she can demonstrate Shoppers Food Warehouse had constructive knowledge of the dangerous condition from the video showing her falling but Shoppers Food Warehouse "has continually refused to provide the video, which would have shown how long the grapes were on the floor." Pl.'s Opp'n at 8. The Court notes that although Mr. Warfield declined to show the video to Mr. Muse and Jessamyn Muse, at Mr. Muse's request, Mr. Warfield wrote a note describing what he saw on the video. The note states the date and approximate time that Mrs. Muse fell in the store. There is no reference to another customer and no reference to grapes on the floor or how those grapes ended up on the floor.

In assessing the factual evidence and inferences to be drawn therefrom in the light most favorable to Mrs. Muse, if the unidentified male customer was responsible for dropping the

grapes on the floor *before* Mrs. Muse encountered them, there is no evidence regarding *how long the grapes were on the floor*. Shoppers Food Warehouse would have had to become aware of the grapes on the floor in sufficient time to have an opportunity to warn shoppers or resolve the dangerous condition. *Carter v. Shoppers Food Warehouse Md. Corp.*, 126 Md. App. 147, 161, 727 A.2d 958, 965 (1999). Mrs. Muse has not produced "evidence that the dangerous condition *had existed for a sufficiently long period of time for the owner or his employees to correct it or to warn his invitees*." *Keene v. Arland's Dep't Store, Baltimore*, 35 Md. App. 250, 258, 370 A.2d 124, 129 (1977) (emphasis added).

Mrs. Muse asks this Court to presume the grapes were on the floor for the length of time Mrs. Muse was in the store, a period of twenty-five (25) minutes. Mrs. Muse provides no logical basis for this time period. Mrs. Muse has not introduced any evidence showing a correlation between her length of time in the store before falling and when the grapes were dropped by an unidentified male customer. In short, Mrs. Muse asks this Court to speculate. "[The] inference must . . . be a legitimate inference and not a mere speculation or conjecture. There must be a logical relation and connection between the circumstances proved and the conclusion sought to be adduced from them." *Rawls*, 207 Md. App. at 119, 113 A.2d at 408 (quoting *Benedick v. Potts*, 88 Md. 52, 55, 40 A. 1067, 1068 (1898)). Mrs. Muse has not met her burden and therefore fails to establish Shoppers Food Warehouse's negligence.

## **CONCLUSION**

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and Supervalu is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An Order will be entered separately.

_ May 20, 2011 _____                  _____ /s/ _____

Date                                         WILLIAM CONNELLY

                                       UNITED STATES MAGISTRATE JUDGE